# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### December 7, 2010 Session

## STATE OF TENNESSEE v. STEPHEN DAVIS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-08565      James C. Beasley, Jr., Judge**

---

**No. W2009-01878-CCA-R3-CD  - Filed August 8, 2011**

---

The defendant, Stephen Davis, a pharmacist at Rite Aid, was convicted of one count of obtaining a controlled substance by fraud (a Class D felony) after he filled several suspicious prescriptions for Hydrocodone (a Schedule III controlled substance). The trial court imposed a two-year suspended sentence. On appeal, the defendant claims that the evidence is insufficient to support his conviction and that the trial court erred by denying his motion for a mistrial and by failing to place him on judicial diversion. After carefully reviewing the record and the arguments of the parties, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

James E. Thomas (on appeal), and John Candy and Louis Chiozza (at trial), Memphis, Tennessee, for the appellant, Stephen Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; William L. Gibbons, District Attorney General; and Anita Spinetta, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This appeal concerns a pharmacy employee who filled dubious painkiller prescriptions at suspiciously low prices. In the summer of 2007, the defendant had worked as a pharmacist with the Rite Aid Corporation for more than ten years and served as a manager-level pharmacist of the Rite Aid in Bartlett, Tennessee. His legal troubles began when a subordinate pharmacist technician, Mr. Larry Cross, started to notice that beginning on May

17, 2007, the same patient name, "Nancy Miller," was showing up in the store's computer system every few days as receiving filled prescriptions for Hydrocodone – a powerful and addictive painkiller which is also a Schedule III controlled substance. Mr. Cross became concerned because he had never seen or met a Ms. Nancy Miller, and the amount of Hydrocodone that was being dispensed to her was highly unusual. The "Nancy Miller" prescriptions were always filled during a time that the defendant was the pharmacist on duty, and Mr. Cross became further concerned because he never assisted with filling any of these prescriptions – a fact he also found unusual. Rather than raise his concerns with the defendant, Mr. Cross opted to go over his head and reported the situation to Mr. Shan Parker, the Rite Aid pharmacy district manager in charge of overseeing the Bartlett pharmacy.

After conducting some preliminary investigation into the "Nancy Miller" prescriptions using Rite Aid's computer system, Mr. Parker found the amount of Hydrocodone being dispensed to her to be highly unusual. He further discovered that he was unable to locate the legally-required hard copies for any these prescriptions. Mr. Parker brought in Mr. Dustin Higgins, a regional loss prevention director, and the two began to investigate the suspicious activity further. During their investigation, they contacted the doctor listed on the store computer system as the issuing doctor, Dr. Stephen Landy, a neurologist at the Wesley Neurological Clinic. Dr. Landy denied issuing any of the prescriptions and further stated that he had never treated a patient named Nancy Miller who had the birthday and lived at the address provided by the store's computer system.

Mr. Higgins confronted and interviewed the defendant concerning his filling of the "Nancy Miller" prescriptions twice, the first time by surprise as the defendant was leaving work and the second time at an arranged meeting, which Mr. Parker also attended. During these interviews, the defendant admitted to filling the prescriptions listed for "Nancy Miller" and in some cases removing them from the store. The defendant also admitted to putting cash in the register for some of the prescriptions and to lowering the price for each of the prescriptions by overriding the normal price appearing in Rite Aid's computer system. At the conclusion of the initial unannounced interview, Mr. Higgins asked the defendant to empty his pockets, but the defendant refused to do so.

However, while acknowledging that he had made an error of judgment in filling these prescriptions due to the amount of Hydrocodone involved, the defendant asserted that he believed the entire time that he was dealing with legitimate prescriptions, and that he was in compliance with store policy when he filled the prescriptions, lowered the price, and delivered the filled prescriptions to individuals off-site. He claimed that the prescriptions were phoned in and that he made hard copies of the prescriptions on one of the store's in-house prescriptions pads and left them to be filed by someone else. He claimed that the filled prescriptions were usually picked up by someone he believed to be Nancy Miller at the drive-

through window. However, on a few occasions, the defendant removed the filled prescriptions from the store after work, and then drove around to various parking lots and gave them to a man purporting to be Nancy Miller's husband. The defendant claimed that he altered the regular price charged for these prescriptions pursuant to Rite Aid's price-matching policy, which permitted a pharmacist to override the normal price and charge a lower price for a prescription in order to match the price charged by any local competitor. He claimed that the price to which he lowered the "Nancy Miller" prescriptions matched the price quoted to him over the phone by someone from Medicap.

On November 15, 2007, the defendant was indicted on one count of Obtaining a Controlled Substance by Fraud and one count of Theft of Property over $1000, both Class D felonies. He was tried on March 23-27th, 2009. At the trial's conclusion, the jury convicted the defendant of the fraud charge but acquitted him of the theft charge. At sentencing, the trial court denied the defendant's application for judicial diversion and gave him a two-year suspended sentence, placing him on probation for a period of two years. The defendant's motion for a new trial was heard and denied on July 27, 2009. This appeal timely followed.

I.

The defendant claims that the evidence was insufficient to support his conviction for fraudulently obtaining a controlled substance. Specifically, he contends that there was no evidence showing that he actually possessed any Hydrocodone or that he made any misrepresentations in order to do so. We disagree.

For purposes of challenging the sufficiency of evidence on appeal, a jury's verdict of guilt with respect to the charge in question carries great weight and effectively serves to strip the defendant of the presumption of innocence and replace it with a presumption of guilt. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). A defendant generally bears the burden of overcoming this presumption on appeal, a burden rendered all the heavier by the fact that the State is afforded "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom," during appellate review. *Id.* (*quoting State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007)). Matters such as the credibility of witnesses, the weight that ought to be given to their testimony, and the proper resolution of any conflicts in the evidence may not be re-litigated on appeal; these were issues for the jury to decide, and their decision must be respected. *Id.* "[T]he relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*; *see also* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The defendant was convicted of violating Tennessee Code Annotated section 53-11-402(a)(3), which renders it a crime to "[a]cquire or obtain, or attempt to acquire or attempt to obtain, possession of a controlled substance by misrepresentation, fraud, forgery, deception or subterfuge." T.C.A. §53-11-402(a)(3) (2011). Tennessee law further clarifies that "'[f]raud' means as used in normal parlance and includes, but is not limited to, deceit, trickery, misrepresentation and subterfuge, and shall be broadly construed to accomplish the purposes" of our state's criminal laws. T.C.A. §39-11-106(a)(13). The defendant's claims regarding the sufficiency of the evidence concern (1) whether he ever "[a]cquire[d] or obtain[ed] . . . possession"of the Hydrocodone within the meaning of the statute and (2) whether he did so by "misrepresentation, fraud, forgery, deception or subterfuge." *Id.*

The defendant first claims that there is no evidence in the record that he obtained the drugs in question because there was no evidence that anyone ever saw him take the Hydrocodone out of the pharmacy or that he ever retained or used any of the Hydrocodone. However, no such evidence is necessary to support a conclusion that the defendant possessed the Hydrocodone. This jury's conclusion concerning this element of the offense is fully supported by circumstantial evidence as well as the defendant's own testimony.

Mr. Larry Cross testified that the defendant frequently filled large prescriptions for Hydrocodone under the name "Nancy Miller" and that the filled bottles would no longer be present at the pharmacy during his next shift. He further testified that the defendant told him that he was not to handle any prescriptions for "Nancy Miller," that the defendant always filled these prescriptions himself, and that he had never seen a customer named "Nancy Miller" appear either in the store or at the drive-through window. Other witnesses testified that no prescriptions were ever filled for "Nancy Miller" during the shifts when a pharmacist other than the defendant was on duty. Finally, the State presented the testimony of a Ms. Nancy Miller, who once resided at the address provided for on the "Nancy Miller" Hydrocodone prescriptions and whose middle initial and birthday matched the prescriptions filled by the defendant, who stated that she lived in Wisconsin during the relevant time period, had never been a customer of the Bartlett Rite Aid, and had never picked up any prescriptions there or given anyone else permission to do so. This evidence – while circumstantial – is certainly sufficient and could reasonably support the jury's conclusion that the defendant himself was obtaining possession of the Hydrocodone.

In addition, the defendant himself gave direct evidence during his testimony that he obtained and removed filled Hydrocodone prescriptions under the name "Nancy Miller" from the store on three occasions. While the defendant further claimed that he did so in order to provide good customer service by hand-delivering these prescriptions to Nancy Miller (through the intermediary of an individual purporting to be her husband) at a site off-premises, the jury was free to disbelieve this explanation.

-4-

Moreover, regardless of the drugs' ultimate destination – whether the defendant kept them, used them, sold them, or simply gave them away to either a stranger or someone he knew – the defendant's admission that he possessed the controlled substance, no matter how briefly, suffices to satisfy the statute's requirement that he "acquire or obtain . . . possession" of the prohibited drugs and suffices to uphold liability under this specific element of the statute. The statute expressly criminalizes even the "attempt to acquire or attempt to obtain" the specified controlled substances, so long as the attempt is one made by fraud, *etc.* Consequently, the "possession" element of section 53-11-402(a)(3) would appear to be satisfied under the proper circumstances even if the controlled substance was never in fact in the defendant's actual possession. The defendant's contention that no evidence exists to support the statute's "acquire or obtain . . . possession" requirement simply because no one ever saw him take or use the drugs in question must therefore be rejected.

The defendant next claims that there was "no proof . . . that he misrepresented anything," which we understand to be a claim that there is no record evidence that he made any misrepresentations in furtherance of an attempt to possess Hydrocodone. In support of this claim, the defendant references his testimony to the effect that while he did remove Hydrocodone from the Rite Aid pharmacy, he did so in order to deliver what he believed to be valid call-in prescriptions for a "Ms. Nancy Miller," and he did not make any misrepresentations in the course of doing so. While it would not have been outside of the realm of possibility for a jury to elect to credit this testimony and find that the defendant was an innocent victim in this entire affair, this particular jury did not choose to do so, and its conclusion is supported by considerable circumstantial evidence.

The record contains substantial evidence that the defendant entered false statements concerning the existence of Hydrocodone prescriptions for a "Nancy Miller" into the Rite Aid computer system. Store witnesses testified that the Rite Aid computer system listed numerous prescriptions for Hydrocodone that were filled for a "Nancy Miller," between May 17, 2007, and July 30, 2007. Store witnesses testified that no hard copies of these prescriptions could ever be located. The prescriptions appearing in the system listed the patient's birthday and gave her specific address in Memphis, Tennessee. A Nancy Miller, whose former address was at that specific address in Memphis and whose middle initial and birthday matched the "Nancy Miller" appearing on the Rite Aid computer system, testified that she had never seen the doctor listed as the issuing physician in the system and had never been prescribed Hydrocodone. Dr. Stephen Landy, who was listed as the issuing physician on the information appearing on the Rite Aid computer system, testified that he never had as a patient anyone named Nancy Miller with an address and birthday matching that appearing on the Rite Aid system, that he never issued the prescriptions that were filled by the defendant, and that he would never issue prescriptions for Hydrocodone in the amount listed as prescribed for "Nancy Miller" because it would be unsafe for the patient and had the

potential to cause liver failure. From this and other testimony, a jury could reasonably reach the conclusion that no prescription for Hydrocodone had ever been issued to "Nancy Miller."

Yet somehow numerous prescriptions for Hydrocodone under the name "Nancy Miller" appeared in the Rite Aid system and were filled by the defendant. The defendant implies that this was the result of some sort of conspiracy. He testified that he received call-in prescriptions for a "Nancy Miller," entered her information into the system pursuant to those phone calls, and verified the prescription with the issuing doctor at least once – conflicting with the testimony of Dr. Landy that no such prescriptions were ever issued. He testified that he created hard copies for these prescriptions and placed them in a basket to be filed, all in accordance with store practice – conflicting with the testimony of numerous store witnesses that none of these copies were ever seen or could ever be located. And the list of conflicting testimony could go on. However, in light of the circumstantial evidence summarized above, a rational jury could certainly have concluded that, with respect to this case, the simplest explanation for the testimonial discrepancies was the best one: the defendant, who had the access and means necessary to do so, simply entered the false prescription information into the Rite Aid computer system. When appealing a sufficiency of the evidence claim, all conflicting evidence is resolved in favor of the State. *See Dorantes*, 331 S.W.3d at 379. The defendant has failed to overcome the presumption of guilt that attached after the jury's guilty verdict with respect to his making of false statements. His claim is therefore denied.

## II.

The defendant's second claim is that the trial judge erred in failing to grant a mistrial after the prosecution asked him a question on the stand concerning prior drug addiction. "The decision of whether to grant or deny a motion for a mistrial rests within the sound discretion of the trial court" and will not be reversed "absent a clear showing that the trial court abused its discretion." *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004). In general, a mistrial is only "an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *Id.* (*quoting State v. Land,* 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "[T]he burden of establishing the necessity for mistrial lies with the party seeking it," *Land*, 34 S.W.3d at 527, and in this case the defendant has not borne his burden.

As matters transpired in the court below, while the defendant was being cross-examined on the stand, the prosecutor asked the question, "Mr. Davis, you yourself have had prior problems with Hydrocodone?" Defense counsel objected before the defendant answered. A bench conference, followed by a jury-out hearing over the admissibility of any evidence pertaining to the defendant's prior Hydrocodone use and his disciplinary record

before the Board of Pharmacy relating to it, immediately ensued. The prosecution argued that evidence of his prior addiction to Hydrocodone was relevant and that the defense had opened the door to impeachment of the defendant's character by asking him during his direct examination whether he was a "good" pharmacist. The defense argued that evidence concerning his addiction and any subsequent discipline concerning it was unduly prejudicial and was inadmissible as evidence of a prior bad act pursuant to Tennessee Rule of Evidence 403. The trial court ultimately ruled in favor of the defense and refused to permit any questions by the prosecution concerning the defendant's Hydrocodone use except during the time period during which the suspicious prescriptions were filled.

During the same jury-out hearing, the trial court denied the defense's request for a mistrial based on the fact that the question concerning the defendant's Hydrocodone problems had been asked in the presence of the jury. However, the trial court granted the defense's request for a curative instruction and stated to the jury when it returned that:

> [R]ight before the break there was a question asked about some prior problem with Hydrocodone. That – I have ruled that's an improper question. You're not to consider that. You are to totally disregard that question. And we're going to move on. Does everybody understand that? Okay.

Nonetheless, the defendant urges that once the prosecution insinuated that the defendant had a prior addiction to Hydrocodone, the jury necessarily inferred that the defendant was using the Hydrocodone that was prescribed for "Nancy Miller," and that it was "impossible for a juror to put [this question] out of [his or her] mind[] and disregard it."

Although we are not entirely unsympathetic to the defendant's argument that it is difficult to unring such a loud proverbial bell, the law is clear that "[j]urors are presumed to follow the instructions of the court." *Robinson*, 146 S.W.3d at 494; *see also State v. Stout*, 46 S.W.3d 689, 715 (Tenn. 2001); *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002); *State v. Smith*, 893 S.W.2d 908, 923 (Tenn. 1994). The judge's instruction was very explicit on the point that the jury was to completely disregard the prosecutor's question. We must assume on appeal that the jury followed this instruction.

Moreover, reviewing the record as a whole, we do not believe that the prosecutor's act of asking this solitary question concerning the defendant's prior problems with Hydrocodone so tainted the proceedings that allowing the trial to continue could be considered a miscarriage of justice. The information sought to be elicited by the prosecution's question was not inherently inadmissible – when the State seeks to introduce evidence concerning a defendant's prior bad acts or evidence that is potentially prejudicial to the defense, the Tennessee Rules of Evidence generally require a judge to carefully

scrutinize the evidence at issue, weigh and consider various factors, and evaluate the overall impact of the evidence in a particular case prior to determining the evidence's admissibility. *See generally* Tenn. R. Evid. 401-404. While the trial court took into consideration all the relevant factors and ultimately ruled that evidence concerning the defendant's prior Hydrocodone addiction was inadmissible – a ruling that was within its discretion – that result was certainly not guaranteed *ex ante*. While ideally any issue concerning the admissibility of this evidence would have been decided prior to trial and entirely outside the presence of the jury, its resolution in the course of events as they actually transpired is not so offensive to any traditional notion of justice that the judge should have felt obligated to terminate the trial entirely. That questioning ceased and the jury was excused before the defendant ever answered the question only lends strength to this conclusion. The defendant's claim that the trial judge erred by failing to grant his motion for a mistrial is therefore denied.

III.

The defendant's final claim is that the trial court erred in denying his request for judicial diversion. "Judicial diversion is legislative largess whereby a defendant adjudicated guilty may, upon successful completion of a diversion program, receive an expungement from all 'official records' any recordation relating to 'arrest, indictment or information, trial, finding of guilty, and dismissal and discharge' pursuant to the diversion statute." *State v. Schindler*, 986 S.W.2d 209, 211 (Tenn. 1999) (*quoting* T.C.A. § 40-35-313(b)). A candidate who is granted judicial diversion and successfully completes the program as outlined in section 40-35-313 is never legally convicted of the offense charged and, after receiving an order of expungement, is effectively " restore[d] . . . in the contemplation of the law, to the status the person occupied before the arrest or indictment or information." T.C.A. 40-35-313(b). With extremely rare exceptions, the individual in question may legally deny ever having been arrested, indicted, or tried of the offense or offenses "in response to any inquiry made of the person for any purpose" without fear of being charged with perjury or suffering any other penalty of law. *See id.* For individuals engaged in professional careers or those whose jobs require them to be licensed or certified by a professional board or governing body, the impact of a trial court's decision to either grant or deny judicial diversion upon their ability to continue to practice their chosen profession is profound in the extreme.

For this reason, the decision regarding whether to grant or deny judicial diversion is often among the most solemn decisions a trial judge must make. It requires devoting fastidious attention to a panoply of issues concerning the defendant and crime at issue, and a careful weighing of societal interests. In reaching an informed decision regarding whether to bestow the boon of diversion to a particular defendant, "the trial court must consider (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and

mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused." *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). Because the trial court is in the best position to consider and evaluate each of these factors, the decision to grant or deny diversion generally remains in the trial judge's discretion and will only be reversed on appeal if that discretion is abused. *State v. Cutshaw*, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997); *State v. Bonestel*, 871 S.W.2d 163, 167 (Tenn. Crim. App. 1993). "To find an abuse of discretion, we must determine that no substantial evidence exists to support the ruling of the trial court." *Cutshaw*, 967 S.W.2d at 344 (*citing Bonestel*, 871 S.W.2d at 168; *State v. Anderson*, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992)). However, in this case, substantial record evidence supports the trial court's ruling.

The law requires that when a trial court denies diversion and bases its determination on only some of the legally-required considerations, "it must explain why these factors outweigh the others." *Electroplating, Inc.*, 990 S.W.2d at 229. The court below complied with this requirement. At hearings held on April 24, 2009, and June 1, 2009, the trial court carefully considered the evidence and the arguments of the parties and analyzed all the legally-required factors. The trial court found that four of the seven legally-required factors balanced in favor of judicial diversion, three balanced against, and explained why the three factors balancing against diversion outweighed the four factors balancing in its favor.

Balancing in favor of judicial diversion, the court examined the defendant's criminal history and deemed that he had no criminal record. Concerning the accused's amenability to correction, while the trial court found his lack of candor regarding his commission of the offense and the circumstances surrounding it troubling, in the end the trial court concluded that there was nothing in his background or character that indicated that he would not be amenable to correction. Respecting the accused's social history, the court considered numerous letters written on his behalf by members of the community, which generally lauded his skill as a pharmacist and praised his contributions to the community – including his history of assisting others who suffered from substance abuse. Finally, the trial court considered the accused's mental and physical well-being, including the defendant's prior success in overcoming addiction and an existing ailment in his leg. The court considered all of these factors to weigh in the defendant's favor.

However, the trial court considered the remaining three factors to weigh against judicial diversion. The court carefully considered the circumstances of the offense, which involved his obtaining possession of a very large quantity of a controlled substance and his abuse of a position of trust in the community, and considered this factor to weigh strongly against diversion. In considering the need to exert a deterrent effect on the defendant and others, the trial court noted the testimony concerning the numerous ethical rules that the

defendant broke during his course of conduct, and spoke eloquently of the need to ensure that pharmacists are not tempted to jeopardize their patients' health or their own. Finally, the trial judge deemed diversion to not be in the public interest or the interest of the accused – even taking the accused at his word that he delivered all of the Hydrocodone at issue to an unidentified person, he provided an addictive substance at very dangerous levels to members of the community without taking adequate precautions to ensure the public's safety.

The defendant asserts that no record evidence supports the trial judge's conclusions with respect to these latter three findings. With respect to the circumstances of the offense, the defendant urges that there was no evidence revealing what happened to the Hydrocodone prescribed to "Nancy Miller," and no indication that the defendant was taking or abusing the prescription drugs. However, any lack of evidence concerning the ultimate destination of the Hydrocodone at issue does not undercut the trial judge's conclusion regarding the unfavorable circumstances of the offense – the unauthorized release of such a large amount of a controlled substance into the community at large, regardless of its ultimate destination, is a factor that the trial court was free to weigh against the defendant. With respect to the trial court's analysis of the deterrence factor, the defendant claims that "there was absolutely no proof that the defendant violated any ethical rules." This contention simply flies in the face of the trial record. Both witnesses, Dr. Stephen Landy and Shan Parker, a pharmacist, testified that the frequency and dosage of the Hydrocodone being dispensed under the name "Nancy Miller" would have been dangerous to the health of anyone consuming it. Record evidence establishes that the defendant, an experienced pharmacist, necessarily knew this fact as well or better than anyone. Knowingly dispensing medication in a manner that endangers human life clearly violates the fundamental principle of the Hippocratic oath and ethical norms that ought to have been self-evident to the defendant.

After carefully considering each factor, the trial court concluded that the weight of the factors balanced against the defendant, and placed his reasons for reaching this conclusion and denying judicial diversion on the record. The trial judge was well within his discretion in reaching this conclusion, as record evidence supports each of the trial court's findings. Consequently, we will not disturb the trial court's decision on appeal. The defendant's claim is denied.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE